**RALPH LUMBER CO., Inc., v. FLEMING LUMBER CO.**

No. 17185.

Court of Appeal of Louisiana. Orleans.

Oct. 30, 1939.

John H. Hammel, Jr., of New Orleans, for appellant.

Montgomery & Montgomery, of New Orleans, for appellee.

WESTERFIELD, Judge.

The Ralph Lumber Company, Inc., an Alabama Corporation, brings this suit against R. H. Fleming, doing business in the City of New Orleans as the Fleming Lumber Company, claiming $220.29, with legal interest from June 30, 1936. Plaintiff's claim is based upon the sale and delivery of 25,430 feet of No. 3 Common Long Leaf Yellow Pine at $21 per thousand feet, F. O. B. Cleveland, Ohio. The defendant resists plaintiff's demand upon the ground that the lumber delivered by plaintiff was not as ordered, but of an inferior grade and because it was rejected by the Liberty Lumber and House Wrecking Company of Cleveland, Ohio, to which defendant had sold the lumber, as unfit for building purposes. Averring that in order to minimize the loss for all parties concerned, defendant eventually sold the shipment of lumber to the Ætna Housewrecking and Lumber Company for $325, and that it had paid $231.78 for freight which, together with demurrage and other expenses, including loss of profit on sale, which it had arranged with the Liberty Lumber and House Wrecking Company, amounted to $388.07, and that, therefore, it had sustained a loss of $63.07, for which defendant asked judgment in reconvention.

There was judgment below in favor of plaintiff as prayed for and dismissing the reconventional demand. Defendant has appealed.

On June 8, 1936, the Fleming Lumber Company, following certain preliminary negotiations by telegraph and letters, gave its formal order to the Ralph Lumber Company for "One Large Car, 20 M Ft or more, if possible: 2 x 8 & Wider, #3 Com S 4 S Std. Short Leaf Y P, $21.00 per M Ft. Delivered". On June 10th, the Ralph Lumber Company telegraphed the Fleming Lumber Company that it would accept its order if "long leaf Yellow Pine" was substituted for "short leaf". This change was satisfactory to the purchaser and the shipment went forward. It was made up of sizes 2 x 8, 2 x 10 and 2 x 12 and aggregated 25,430 feet which, at $21 per thousand feet, amounted to $534.02, for which sum the Ralph Lumber Company issued its invoice under date of June 11, 1936, and a check for this amount less two percent, the terms of payment agreed upon,

was sent to the Ralph Lumber Company by the defendant. On June 16, 1936, the Fleming Lumber Company wired the Ralph Lumber Company as follows:

"Customer refuses Three Dimension says practically all rotten stock Our representative says impossible sell in Cleveland. We have stopped payment advance check and car is subject your disposition Handle direct with New York Central."

The Ralph Lumber Company acknowledged receipt of the telegram and, under the same date, requested that the lumber be inspected by a representative of the Southern Pine Association of which it was a member. Under date of June 27, 1936, the Fleming Lumber Company wrote the Ralph Lumber Company, saying:

"Please arrange to have official inspection made as quickly as possible. The stock is on hand at the yard of the Aetna Housewrecking Co., #3674 East 93rd St., Cleveland, O.

*       *       *       *       *

"Accordingly, please instruct the SPA to have this car officially inspected with as little delay as possible."

Under date of July 7, 1936, the defendant, by registered mail, wrote the Ralph Lumber Company, stating:

"We phoned the Southern Pine Association today and requested to know whether or not you have made application for this inspection and they said you have not. You advised us over phone you wanted this done, therefore, cannot understand why you do not give it attention, especially since we explained the urgent need of this action being taken at once."

There does not appear to be an explanation of the delay in having the inspection made, but on August 4, 1936, the Ralph Lumber Company wrote the Fleming Lumber Company to the effect that they had just received a report of the official inspection of the lumber by the Southern Pine Association, and enclosed a copy of the report with its letter. This report, a copy of which is in the record, was made by Mr. H. N. Hanbury, who found that there were 15,790 feet of lumber "on grade" and 3,903 feet "below grade". The total amount of lumber inspected was 19,693 feet, but there had been removed from the shipment and accepted by defendant's customer as of No. 3 common quality, 5,737 feet, so that, according to this report, it appears that of the total shipment of 25,430 feet, 3,903 feet was "below grade".

The defendant refused to abide by the Southern Pine Association report because its customer would not accept it, and, in November, 1936, arranged for an arbitration committee of three men, one of whom plaintiff was invited to appoint in order to have the lumber revalued. Plaintiff declined to participate in this arbitration, relying upon the report of the Southern Pine Association. The arbitration, however, was had, in order to consummate the sale of the lumber to defendant's customer, the Ætna Housewrecking and Lumber Company.

On the trial of the case defendant introduced the depositions of a number of lumber dealers as experts. Mr. R. J. Fitzgerald, a lumber salesman of thirty years' experience and a member of the arbitration committee, said: "I found this lumber to be of an inferior grade of #3 Common. The stock was brooked, contained dead rot and a considerable amount of bark and, in my opinion, was nothing but what is termed in the lumber business as culls."

Max Weingarten, Manager of the Ætna Housewrecking and Lumber Company, which subsequently purchased the lumber, said that most of the lumber was rotten "there was no Number 3. I would not call it anything, not even 4." His company, however, paid $325 for the lumber which was sold to defendant for $534.

M. P. Klumph, a lumber broker for twenty-two years, and also a member of the arbitration committee, testified that the inspector of the Southern Pine Association had acted unfairly in grading the lumber.

H. A. Kramer, Secretary of the Cleveland Lumber Institute, and the third and final member of the arbitration committee, thought that a good portion of the shipment was "below grade".

D. C. Phelps, who had been in the wholesale lumber business for forty-five years, said that the lumber was "nearly worthless."

The defendant insists that it cannot be controlled by the rules and regulations of the Southern Pine Association, nor by the inspection of that association, because it is not a member.

It appears that the Southern Pine Association is made up of a group of 350 Lumber Mills and that the particular desig-

nation of "No. 3 Common Pine" used in the order for the lumber is a Southern Pine Association grading. Mr. Hanbury, the inspector for the Southern Pine Association, testified that it was the custom and usage in the lumber trade, where shipments were made to distant parts, and some part of the lumber was "on grade" and some "below grade", to accept and pay for the lumber that was up to grade and to treat the remainder as the property of the seller. He also testified that where the amount of lumber which was below grade did not exceed five percent of the entire shipment, it was customary to pay for all of it.

It seems to us that the difference of opinion concerning the quality of the lumber may, in part, be accounted for by a misunderstanding of what No. 3 dimension common Pine signifies. Defendant apparently sold the lumber for building purposes for which, according to the evidence, it was unsuitable. H. A. Kramer, Secretary of the Cleveland Lumber Institute, testified in response to a question as to what No. 3 Common Pine was fit for, that: "I do not know about other sections of the country, but in this section Number 3 pine is not permissible to be used in home construction or home or factory construction. Building codes here prohibit the use of that grade, and therefore it becomes a grade which in this market can only be used for factory maintenance purposes, skids, some crating, boxing and car bracing or blocking."

R. R. Cahal of the Southern Pine Association said that the No. 3 common pine is the "lowest described grade. The next grade is rejects, frequently referred to as No. 4 common, although there is no such grade as No. 4 common".

From a pamphlet described as "Standard Specifications for Grades of longleaf and shortleaf Southern Pine Lumber and Timber", issued by the Southern Pine Association, we learn that No. 3 longleaf dimension will include all pieces falling below the grade of No. 2 which are suitable for use as cheap building material without wasting more than 25 percent of each piece of one-third of the number of pieces in any item of a shipment, but it must not be more than one-half inch scant of standard finished width nor more than three-eighths inch scant of standard finished thickness".

The defendant's experts appear to be extravagant in their conclusion but, in any event, in our opinion the quality of the lumber must be determined by the inspection of the Southern Pine Association. Plaintiff asked for and defendant agreed to this inspection as we have shown by excerpts from their correspondence. It makes no difference whether defendant was a member of the Association or not, since it accepted its arbitrament of the dispute. That inspection, made in Cleveland, Ohio, showed that only 3,903 feet were below grade. There remained 21,527 feet which was "on grade". Defendant ordered 20,000 feet or more. Plaintiff delivered more than this amount, or 21,527 feet of No. 3 Common, the grade which defendant ordered. Ignoring the 3,903 feet found to be below grade, we see no reason why plaintiff should not have judgment for 21,527 feet at the rate of $21 per thousand or $425.07, less the freight to Cleveland, Ohio, $231.78, or $220.25.

For the reasons assigned, the judgment appealed from is affirmed.

Affirmed.